## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES MCCONICO, JR.,** | ) | |
| **AIS #117395,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:20-00314-TFM-N** |
| | ) | |
| **MARY COOK,** *Warden*, *et al.* | ) | |
|     **Defendants.** | ) | |

## REPORT AND RECOMMENDATIONS

This civil action is before the undersigned on Defendants Warden Mary Cook, Governor Kay Ivey, and Commissioner Jefferson S. Dunn's[1] motions for summary judgment under Federal Rule of Civil Procedure 56. (*See* Doc. 56; Doc. 70).[2] Plaintiff James McConico, Jr., an Alabama prisoner proceeding pro se, did not file a response despite being afforded the opportunity to do so. (*See* Doc. 56; Doc. 70). In turn, Defendants did not file a reply. Upon consideration, the undersigned **RECOMMENDS** that Defendants' motions for summary judgment be **GRANTED**.

## I. *Summary Judgment Legal Standards*

"A party may move for summary judgment, identifying each claim or defense— or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine

---

[1] McConico's complaint acknowledges that, at the time of filing, Defendant Mary Cook was the warden at Fountain Correctional Facility, Kay Ivey was employed as the Governor of the State of Alabama, and Jefferson S. Dunn was employed as the Commissioner of the Alabama Department of Corrections. (Doc. 10, PageID.15).

[2] The District Judge assigned to this case referred these motions to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R) for appropriate resolution. (*See* 11/23/2021 electronic reference).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it might affect the outcome of the suit under governing law and it is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotations omitted). "Summary judgment is only appropriate if a case is 'so one-sided that one party must prevail as a matter of law.' " *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (citation omitted). However, a " 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam). In other words, "there must be enough of a showing that the jury could reasonably find for that party . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quotations omitted).

Overall, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004). "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015)

(quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration adopted) (quotations omitted)); *see also Allen*, 121 F.3d at 646 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (quotations omitted)). "The Court 'must avoid weighing conflicting evidence or making credibility determinations.' " *Ave. CLO Fund*, 723 F.3d at 1294 (quoting *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000)). However, " 'an inference based on speculation and conjecture is not reasonable.' " *Id.* (quoting *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)).

"Where . . . the non-moving party bears the burden of proof on an issue at trial, the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or present 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.' " *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (en banc)). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). "For issues on which the non-moving party will bear the burden of proof at trial, the non-moving party must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.' " *Hammer*, 20 F.3d at 1141 (quoting *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment—only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Allen*, 121 F.3d at 646 (quotation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Id.* (quotation omitted). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it

creates a false issue, the demolition of which is a primary goal of summary judgment.")).

## II. *Relevant Facts*

The undersigned looks to the following submissions to determine the relevant facts for purposes of summary judgment: (a) McConico's first amended complaint (Doc. 10, modified by Doc. 18-1) and (b) Defendants' special reports, declarations, and other exhibits (Doc. 37; Doc. 69).[3]

### a. McConico's Complaint

Per the allegations in McConico's complaint (Doc. 10, modified by Doc. 18-1), which is affirmed under penalty of perjury and substantially constitutes an unsworn declaration under 28 U.S.C. § 1746, the events underlying this dispute occurred during McConico's residence at Fountain Correctional Facility. (Doc. 10, PageID.14).[4]

---

[3] McConico neglected to file any response to Defendants' motions for summary judgment despite being afforded several opportunities to do so. The Court denied McConico's motions for an indefinite extension of his deadline to file a response in opposition. However, the Court extended this deadline by nearly two months. (Doc. 68, PageID.434). McConico still failed to file a brief in opposition or any rebuttal evidence for the Court to consider.

[4] Because McConico is proceeding pro se, the undersigned must liberally construe his pleadings. *See Trawinski v. United Techs.,* 313 F.3d 1295, 1297 (11th Cir. 2002). The Court must also

> credit the "specific facts" pled in [McConico's] sworn complaint when considering his opposition to summary judgment. *Perry v. Thompson,* 786 F.2d 1093, 1095 (11th Cir. 1986) ("Plaintiff alleged specific facts in his sworn complaint and they were required to be considered in their sworn form."); *Sammons v. Taylor,* 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[F]acts alleged in an inmate's sworn pleading are sufficient and . . . a separate affidavit is not necessary.").

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).

McConico claims that he is in imminent danger of losing his life due to a COVID-19 outbreak at the facility, as evidenced by two inmates falling ill with the virus. (Doc. 10, PageID.14). This outbreak, according to McConico, "warrants" several interventions by ADOC and the officials named in the complaint, including the testing of McConico and all other inmates as well as increased use of social distancing measures. (Doc. 10, PageID.14). McConico alleges that Defendants cannot implement increased social distancing measures due to overcrowding at the facility and refuse to test all inmates due to the cost of such a measure, which he estimates to be about $200 for each of the system's 23,000 inmates. (Doc. 10, PageID.18). McConico claims that, at the time of filing, he is in his fourth week of quarantine and is housed with three inmates that "have been found to have COVID-19." (Doc. 10, PageID.18). For relief, McConico requests that (1) the Court to appoint him counsel; (2) Defendants release him or non-violent inmates to allow for social distancing to be implemented; (3) Defendants release him or non-violent inmates to house arrest or other alternative supervision programs; (4) Defendants immediately test all inmates at Fountain and then ADOC's other correctional facilities; and (5) Defendants immediately stop all prison transfers to curb the spread of COVID-19.

In McConico's amendment to his first amended complaint (*see* Doc. 18-1), he alleges that Defendant Mary Cook transferred him to a different ADOC facility in retaliation for him exercising his First Amendment right to file a civil suit. On November 18, 2020, McConico claims that he was in Fountain's law library gathering affidavits from fellow inmates in support of the present suit and informing them

about the process for filing their own suits. (Doc. 18-1, PageID.45–46). McConico then alleges that Warden Cook walked into the library and listened to the conversation before stating "you just do what you want to do." (Doc. 18-1, PageID.46). McConico responded that he and the other inmates were concerned about their safety due to ADOC's inadequate response to COVID-19. (Doc. 18-1, PageID.46). McConico also told Warden Cook about their efforts to learn about their constitutional rights. (Doc. 18-1, PageID.46).

The next day, McConico claims that Warden Cook transferred him to Easterling Correctional Facility, which is also suffering from a COVID-19 outbreak. (Doc. 18-1, PageID.46–47). McConico alleges that he was unable to take "all [of] his legal work" or about $400 worth of tobacco products. (Doc. 18-1, PageID.46). Warden Cook initiated this transfer to "chill" his right to access the courts, McConico explains, and requests the following relief: (1) a transfer back to Fountain; (2) $250,000 in compensatory damages; (3) $350,000 in punitive damages; and (4) release to home supervision via a leg monitor. (Doc. 18-1, PageID.47–48).

## b. Defendants' Special Reports, Declarations, and Exhibits

In response to McConico's allegations, Defendants submitted unsworn declarations under 28 U.S.C. § 1746 and other evidence illustrating its response to COVID-19 from the start of the pandemic. Defendants claim that McConico has failed to allege (1) how COVID-19 presents a substantial risk of serious harm to him personally; and (2) that Defendants knew of such serious risk and disregarded the risk with a sufficiently culpable state of mind. (Doc. 37, PageID.124). Defendants

assert that they have recognized the danger created by COVID-19 and have reasonably responded to the risks, taking the following actions:

- Educating inmates and staff through oral and written communication, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

- Encouraging inmates and staff to engage in proper hygiene practices and social distancing;

- Providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand washing, but not in housing units and recreational areas due to the potential for misuse in creating drinking alcohol;

- Continuing medical appointments such as chronic care clinics and sick-call appointments;

- Suspending copays for inmates seeking medical services;

- Implementing enhanced cleaning and disinfecting procedures;

- Suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

- Performing verbal screening and temperature checks for all person entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit

or other symptoms of COVID-19, denying the person entry into the facility;

- Implementing social distancing strategies;

- Providing two masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;

- Providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

- Providing personal protective equipment, including masks and gloves, to medical and mental-health staff, along with instruction on wearing, cleaning, and caring for the masks;

- Implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected or having or being exposed to COVID-19;

- Monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two of the following symptoms: fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

- Testing and isolating inmates with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

(Doc. 37-1, PageID.148–50).

Defendants maintain, through the unsworn declaration of Ruth Naglich, Associate Commissioner for Health Services, that ADOC began planning for COVID-

19 early in March 2020.[5] (Doc. 37-2). At the facility level, ADOC and Wexford Health Sources, Inc. ("Wexford") (which is contracted to provide medical services to inmates in the custody of the ADOC) created Pandemic Planning Teams that included Warden Cook, Health Service Administrator, Office of Health Services ("OHS") Regional Associate Director of Health Services, Medical Director of the facility, and others such as the Facility Food Service Manager and Facility Maintenance. Its planning entailed assessing the levels of correctional and medical staff needed; determining locations for quarantining inmates; evaluating supplies of personal protection equipment, soap, paper towels, disinfectants, and food; and educating staff and inmates about the signs and symptoms of COVID-19. On March 23, 2020, the CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-2019) in Correctional and Detention Centers" (CDC Guidance) that contained guiding principles for prisons. ADOC utilized said guidance and provided education about COVID-19 to persons living and working in the ADOC's facilities, and ADOC posted in its facilities, including Fountain, documents from OHS and CDC explaining signs and symptoms of COVID-19, what to do if you have them, proper hygiene and other preventive practices, and how to address stress associated with COVID-19.

Acting on CDC's Guidance, and after consulting with the Alabama State Health Officer, ADOC quit receiving new intakes and closed its facilities to all outside

---

[5] Ruth Naglich, as Associate Commissioner for Health Services, is "very familiar with ADOC's current healthcare delivery systems and the policies and procedures that guide healthcare services provided to inmates at various facilities" due to her role in providing "administrative oversight of the ADOC's Office of Health Services ("OHS") and the ADOC health services contractors. (Doc. 37-1, PageID.141).

visitors to avoid the introduction and spread of COVID-19 into the ADOC system. (Doc. 37-2). On March 20, 2020, ADOC Commissioner Dunn announced a 30-day moratorium on taking in new inmates to ADOC's system, with one exception for state inmates with severe medical conditions, who would be approved on a case-by-case basis by OHS.

With regard to staff, ADOC began screening staff upon arrival for work or when they called in sick. (Doc. 37-2). Employees who reported for work had a temperature check and questionnaire to which to respond. (*Id.*). And, for sick employees, ADOC created a tracking log and a questionnaire to determine when an employee may return to work. Cleaning instructions were provided by ADOC, which included a checklist for the kitchen. And the facilities were also reviewed by ADOC for compliance. Facemasks were offered to inmates and persons working at the facilities, and written directions for their proper use, storage, removal, and cleaning were provided.

During the thirty-day moratorium on new intakes, a new intake process was developed and implemented on April 21, 2020, for all inmates, except maximum security inmates, with intake for male inmates being at Draper Correctional Facility and intake for females being at a satellite facility near Julia Tutwiler Prison for Women (Tutwiler). (Doc. 37-2). This pilot program was developed to protect the existing inmate population and to be consistent with CDC Guidance; the new intakes are quarantined for fourteen days before they are transferred to Kilby Correctional Facility or Tutwiler to complete the intake process, assuming an inmate has no signs

or symptoms of COVID-19 or tests positive for it. At the conclusion of pilot program, ADOC will evaluate continuing, changing, or terminating it. Depending on the conclusion, the possibility exists for the reinstitution of the moratorium on intakes from county jails.

In a separate unsworn declaration, Captain Willie Knight—a correctional officer that interacted with McConico and worked at Fountain during the inmate's residence at the facility—avers that ADOC and Wexford employed the procedures described by Associate Commissioner Naglich. (*See* Doc. 37-4, PageID.217–22). Captain Knight also states that McConico enjoyed frequent access to the law library at Fountain when he was not quarantined under the facility's COVID-19 policy. (*See* Doc. 37-4, PageID.216–17).

John Crow—the senior ranking warden at Easterling Correctional Facility— also submitted an unsworn declaration confirming that "Associate Commissioner Naglich provides a thorough description of ADOC's efforts to combat the spread of COVID-19, and her description is consistent with the efforts made to meet the needs at Easterling." (Doc. 37-3). Further, Warden Crow details the "aggressive" effort to vaccinate both inmates and staff at the facility.

In response to McConico's allegations regarding his transfer to Easterling, Defendants submit the unsworn declaration of Angie Baggett, who serves as Director of Classifications for ADOC. (Doc. 37-7). Baggett explains the circumstances behind McConico's transfer to Easterling:

> In October 2020, the Central Review Board approved a reduction in his custody level to minimum custody—security level four (SLIV).

Fountain is a security level five (SLV) facility. For male inmates, ADOC has seven SLIV facilities located throughout the state—Bullock Correctional Facility ("Bullock"), Bibb County Correctional Facility ("Bibb"), Easterling, Staton Correctional Facility ("Staton"), Elmore Correctional Facility ("Elmore"), Ventress Correctional Facility ("Ventress"), and Hamilton Aged & Infirmed.

According to Mr. McConico's most recent Classifications Summary, he has documented enemies at seven ADOC facilities: Limestone, Kilby, Fountain, Elmore, Bullock, Staton, and Ventress. The last four—Elmore, Bullock, Staton, and Ventress—are SLIV facilities. Due to safety/security concerns, ADOC attempts to avoid placing an inmate in a facility with a documented enemy. Easterling and Bibb were the only enemy-free available placements consistent with Mr. McConico's change in classification. Hamilton was not a viable option because Mr. McConico would have required a medical recommendation.

It is not uncommon for inmates to have frequent transfers within the ADOC system. There are many reasons inmates are transferred, including medical and mental health, security reasons, classification changes, programming needs, enemy separation, and even housing (bed) needs of facilities. As reflected in Mr. McConico's Inmate Movement History, ADOC has transferred him ten times in the last five years.

(Doc. 37-8, PageID.239–40).

### III.  *Analysis*

"To establish a claim under 42 U.S.C. § 1983, a plaintiff must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law." *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005). Here, Defendants do not dispute that they were acting under color of state law, leaving only the matter of whether McConico's constitutional rights were violated to be addressed. McConico claims that Defendants violated his Eighth and First Amendment rights, while Defendants challenge McConico's standing in addition to raising sovereign and qualified immunity defenses. The undersigned will

address the issues as follows: (a) McConico's standing; (b) Defendants' sovereign immunity defense; (c) the physical injury requirement for compensatory damages; (d) McConico's claims against Governor Ivey; and (e) McConico's remaining claims.

## a. Standing

Defendants assert that McConico lacks standing to sue for injunctive relief for his Eighth Amendment claim because he is not currently facing an injury and has not put forth any proof that he is likely to suffer an injury in the future. (Doc. 37, PageID.134). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Williams v. Bd. of Regents of University System of Georgia*, 477 F.3d 1282, 1302 (11th Cir. 2007) (citation omitted); *see also Koziara v. City of Casselberry,* 392 F.3d 1302, 1305 (11th Cir. 2004) ("For a plaintiff seeking prospective relief to have standing, he must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.") (citations and internal quotation marks omitted); *Focus on the Family v. Pinellas Suncoast Transit Authority,* 344 F.3d 1263, 1274 (11th Cir. 2003) (holding "where a plaintiff seeks these types of prospective relief, it must demonstrate a real and immediate threat of future injury to satisfy the injury in fact requirement") (citations and internal quotation marks omitted).

McConico has alleged facts indicating an imminent risk of contracting COVID-19 and the likelihood of severe harm if infected. On similar facts, the Supreme Court

has previously held that a prisoner's Eighth Amendment claim could be based upon possible future harm to health, declaring:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S. Ct. 2565, 2569, 57 L. Ed. 2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." *DeShaney, supra,* 489 U.S., at 200, 109 S. Ct., at 1005. It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Youngberg v. Romeo,* 457 U.S. 307, 315–316, 102 S. Ct. 2452, 2457–2458, 73 L.Ed.2d 28 (1982). It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event. Two of them were cited with approval in *Rhodes v. Chapman,* 452 U.S. 337, 352, n. 17, 101 S. Ct. 2392, 2402, n. 17, 69 L. Ed. 2d 59 (1981). *Gates v. Collier,* 501 F.2d 1291 CA5 1974), held that inmates were entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and the mingling of inmates with serious contagious diseases with other prison inmates. *Ramos v. Lamm,* 639 F.2d 559, 572 (CA10 1980), stated that a prisoner need not wait until he is actually assaulted before obtaining relief.

*Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). Given the ongoing nature of the COVID-19 pandemic and the facts put forth by McConico, the undersigned finds he has standing to pursue his Eighth Amendment claim. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, (2014) (holding that allegations of increased risk of harm or future injury establish standing "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur").

### b. Sovereign Immunity

Defendants invoke sovereign immunity as a defense against McConico's claims against them in their official capacities. The Eleventh Amendment specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," and applies "equally to suits against a state brought in federal court by citizens of that state." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998). "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67, (1985)). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).

While McConico does not expressly bring his claims against Defendants in their official capacities, he does list their positions as government officials in the complaint. (*See* Doc. 10, PageID.15). It is well settled in this circuit that suits seeking

monetary relief against state correctional officers in their official capacities are generally barred by the Eleventh Amendment. *See Taylor v. Adams*, 221 F.3d 1254, 1256 (11th Cir. 2000); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Dean v. Barber*, 951 F.2d 1210, 1215 n.5 (11th Cir.1992); *Free*, 887 F.2d at 1557.

> Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Powell v. Barrett*, 496 F.3d 1288, 1304, 1308 (11th Cir. 2007) (state defendants sued in their official capacity for monetary damages are immune from suit under the Eleventh Amendment).

*Johnson v. Keaton*, No. 2:05-CV-1238-WKW, 2008 WL 4493242, at *6 (M.D. Ala. Sept. 29, 2008)).

Neither party disputes that Defendants were state officials at the time the action arose. Accordingly, to the extent McConico seeks monetary damages from Defendants in their official capacities, they are entitled to sovereign immunity. Defendants should be awarded summary judgment in their favor on McConico's claims for monetary damages against them in their official capacities.

### c. Physical Injury Requirement for Compensatory Damages

Defendants also argue that McConico cannot recover compensatory damages because he does not allege that he suffered a physical injury. (Doc. 37, PageID.132). Under 42 U.S.C. § 1997e(e), a prisoner cannot collect compensatory damages unless they suffered a physical injury. Here, McConico's alleged harm is only (1) the potential harm he may suffer if he were to contract COVID-19, and (2) the inconvenience he suffered by transferring from Fountain to Easterling. Nowhere in McConico's operative pleadings does he allege that he has suffered any physical harm. Accordingly, any claim for compensatory damages brought by McConico is due to be dismissed.

McConico's various claims for injunctive relief as well as his claim for punitive damages against Warden Cook in her individual capacity (Doc. 18-1, PageID.48) are not barred by § 1997e(e). *Hoever v. Marks*, 993 F.3d 1353, 1358 (11th Cir. 2021) (holding that "§ 1997e(e) does not bar punitive damages in the absence of physical injury"); *Ratliff v. DeKalb Cnty., Ga.*, 62 F.3d 338, 340 n.4 (11th Cir. 1995) ("Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief.").

### d. McConico's Individual Capacity Claims Against Governor Ivey

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of

*respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted). If a supervisor's liability cannot be established based on the supervisor's personal participation in the complained acts, a plaintiff must show a causal connection between the supervisor's actions and the alleged constitutional deprivation. *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (holding that a custom requires showing a practice so settled and permanent that it takes on the force of law). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *West Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007) (quotation marks and citations omitted).

McConico has failed to allege Governor Ivey participated in or has a causal connection to any of the alleged violations of his constitutional rights regarding

COVID-19 conditions at Fountain. McConico's only mention of Governor Ivey by name comes with his listing her in the "Parties" portion of his complaint on the Court's form. McConico's remaining allegations utterly fail to imply personal participation or causally connect Governor Ivey to his deliberate indifference claim or to his health or safety. Merely holding Governor Ivey liable because of the office she holds—without any facts supporting an inference that she knew of a risk to McConico or acted deliberately toward McConico's health or safety—will not suffice. To the extent McConico seeks to hold Governor Ivey responsible for prison employees' failures to follow appropriate COVID-19 guidelines or provide adequate protection, simply because she is governor, his claims fail for the same reason. Accordingly, McConico has failed to state a claim upon which relief may be granted, and the undersigned **RECOMMENDS** that summary judgment be **GRANTED** in favor of Defendant Governor Kay Ivey and that she be **DISMISSED** from this case in its entirety.

### e. McConico's Remaining Claims

After applying the initial bars to recovery discussed above, the undersigned will now address the following claims from McConico's first amended complaint (Doc. 10, modified by Doc. 18-1): (1) deliberate indifference claims seeking injunctive relief against Warden Cook and Commissioner Dunn in their official capacities; and (2) a retaliatory transfer claim against Warden Cook in her official capacity (for the requested injunctive relief) and in her individual capacity (for the requested punitive damages).

1. *Deliberate Indifference Claim*

McConico claims that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.[6] Specifically, McConico alleges that Warden Cook and Commissioner Dunn have failed to institute sufficient COVID-19 mitigation measures, constituting deliberate indifference to the substantial harm presented by the virus. (Doc. 10, PageID.18). Prison officials violate the Eighth Amendment through "the unnecessary and wanton infliction of pain." *Farmer v. Brennan,* 511 U.S. 825, 836 (1994). The Supreme Court has defined wantonness as "deliberate indifference to a substantial risk of serious harm to a prisoner." *Id.* Thus, to establish an Eighth Amendment violation, a prisoner must prove both an objective and a subjective component, whether the treatment received by the prisoner is characterized as "inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the deliberate indifference standard . . . ." *Helling,* 509 U.S. 25, 32.

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

*Sims v. Mashburn*, 25 F.3d 980, 983 (11th Cir. 1994).

To prevail, a plaintiff must prove that there was "a substantial risk of serious harm" and that the defendant was subjectively deliberately indifferent to that risk.

---

[6] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US CONST. amend. VIII; *see also Robinson v. California*, 370 U.S. 660 (1972) (holding that the Eighth Amendment is applicable to the states through the Fourteenth Amendment).

*Farmer*, 511 U.S. at 832–34. In defining "deliberate indifference," the Supreme Court has stated:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. *See e.g., LaMarca v. Turner*, 995 F.2d 1526, 1535 (CA11 1993). . . . It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

*Id.* at 836. Thus, the Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment. *Id.* at 839–40. Under this test, there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not . . . ." *Id.* at 838. It is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. *See, e.g., Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996).

> In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the 1983 risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," . . . a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Farmer*, 511 U.S. at 844–45 (internal quotations and citations omitted).

Here, the parties do not dispute that COVID-19 presents an objectively substantial risk of serious harm. (Doc. 37, PageID.124). Assuming McConico could

show that COVID-19 objectively presents a substantial risk of serious harm to him,[7] Defendants demonstrated in their motions for summary judgment that they have taken measures to implement precautions to protect McConico and other inmates from the virus as recommended by the CDC. (*See, e.g.*, Doc. 37-1). Defendants have shown that ADOC facilities—including Fountain and Easterling—implemented comprehensive procedures to, among other things, monitor inmates and staff for signs of infection, enhanced cleaning procedures, and a limitation on new intakes and transfers of inmates. (Doc. 37-1, PageID.148–50). Accordingly, Warden Cook and Commissioner Dunn have satisfied their burden of showing that they did not "disregard [] the risk [of COVID-19] by conduct that is more than mere negligence." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing *Farmer*, 511 U.S. at 836). Stated another way, Warden Cook and Commissioner Dunn have shown that they did not recklessly disregard the COVID-19 risk to McConico or other inmates. *Id*. Thus, the burden shifts to McConico to show otherwise.

The only evidence that McConico presents to meet this burden comes from the allegations in his sworn amended complaint. (Doc. 10, modified by Doc. 18-1). Specifically, McConico claims that Defendants failed to implement effective social distancing and widespread testing at Fountain due to overcrowding and costs (Doc.

---

[7] McConico fails to allege any specific facts indicating that he faces a risk of serious harm. Defendants acknowledge, however, that McConico suffers from hypertension and is pre-diabetic (*see* Doc. 37, PageID.122) which may exacerbate the severity of a COVID-19 infection. *See* People with Certain Medical Conditions, Centers for Disease Control and Prevention (May 2, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#.

10, PageID.14–18). McConico does not refute Defendants' ample evidence of the other COVID-19 mitigation measures they have taken.

McConico fails to demonstrate that Warden Cook and Commissioner Dunn recklessly disregarded the risk COVID-19 posed to him and other inmates. The Eleventh Circuit's decision in *Swain* controls here. The *Swain* Court, in vacating a preliminary injunction ordering a Florida jail to take certain steps to curb the spread of COVID-19, reasoned that "[w]hile COVID-19 poses novel health risks to incarcerated inmates—and novel administrative challenges for jail and prison administrators—the law that the district court was bound to apply is well established." *Swain*, 961 F.3d at 1294. The *Swain* Court concluded the trial judge wrongly determined that the increase in rate of infections and the "seeming impossibility" of meaningful social distancing measures were evidence of the defendant's deliberate indifference to inmates' health. *Id*. at 1287. Noting the "high bar" set by the Supreme Court in *Farmer v. Brennan* to establish deliberate indifference, the Eleventh Circuit emphasized that "[e]ven where 'prison officials . . . actually knew of a substantial risk to inmate health or safety,' they may nonetheless 'be found free from liability if they responded reasonably to the risk'—and, importantly for present purposes, 'even if the harm ultimately was not averted.'" *Swain,* 961 F.3d at 1286–87 (quoting *Farmer*, 511 U.S. at 844). The *Swain* Court noted this standard "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id*. (quoting *Farmer*, 511 U.S. at 844–45).

In reaching its decision, the Eleventh Circuit examined the measures defendants implemented as well as the CDC's Guidance document. *Id.* at 1288–90. The CDC Guidance was noted by the Eleventh Circuit for "presuppos[ing] that some modification of its social-distancing recommendations will be necessary in institutional settings" and for providing on its first page, in bold, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." *Id.* at 1288 (quoting CDC Guidance at 1). The CDC Guidance was acknowledged by the Eleventh Circuit for advising that six feet between inmates is the ideal, but distance will need to be tailored to the facility's space and the needs of the inmate population and staff. *Id.* The Court further recognized that to facilitate social distancing at the jail, the defendants had put tape on the floor to encourage social distancing in lines, arranged bunks so that inmates slept head to toe, and staggered patients going to the medical unit. *Id.* at 1288. Also, the defendants required staff and inmates to wear face masks, conducted screening for staff entering the facility, conducted daily temperature checks for all inmates, suspended all outside visitation, and provided disinfecting and hygiene supplies to all inmates. *Id.* at 1289. Given these efforts, the Eleventh Circuit stated, "[w]e simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a jail, the defendants here acted unreasonably by 'doing their best.' Because the defendants 'act[ed] reasonably,' they 'cannot be found liable' under the Eighth Amendment. *Id.* at 1289 (citing *Farmer* at 845).

As *Swain* illustrates, the measures taken by Warden Cook and Commissioner Dunn to prevent or curb the spread of COVID-19 at Fountain do not satisfy the requisite state of mind indicative of subjective deliberate indifference and McConico has failed to carry his burden to show otherwise. Accordingly, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** in favor of Warden Cook and Commissioner Dunn as to McConico's Eighth Amendment claims.

### 2. *Retaliatory Transfer Claim*

McConico claims that Warden Cook violated his First Amendment right to file lawsuits by transferring him to a different correctional facility in retaliation for bringing the current suit. (*See* Doc 18-1). It is well established that inmates are protected by the First Amendment from retaliation by prison officials for filing lawsuits or administrative grievances. *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986); *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997). "To state a first amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989). Rather, "[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech," *id*., with a practice that is "not reasonably related to legitimate penological objectives" or take certain actions "with the intent of chilling that First Amendment right." *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995), citing *Turner v. Safley*, 482 U.S. 78, 85-89 (1987).

> "To state a retaliation claim cognizable under § 1983, a prisoner must demonstrate that (i) he engaged in a constitutionally protected activity, (ii) he suffered adverse treatment simultaneously with or subsequent to such activity, and (iii) a causal connection existed between the protected

activity and the adverse action." *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-01 (11th Cir. 1986); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003)). An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of the evidence, which once established raises a presumption that prison officials retaliated against the inmate. . . . Merely alleging the ultimate fact of retaliation, however, is insufficient. . . . Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to demonstration of a retaliation claim . . . .

If an inmate establishes a prima facie case, the burden then shifts to prison officials to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the prison official retaliated against the inmate. This may be done by the prison official articulating a legitimate, non-retaliatory reason for the adverse decision or action, which is clear, reasonably specific and worthy of credence. The prison official has a burden of production, not of persuasion, and thus does not have to persuade a court that he or she actually was motivated by the reason advanced . . . . Once the prison official satisfies this burden of production, the inmate then has the burden of persuading the court by sufficient evidence that the proffered reason for the adverse decision is a pretext for retaliation.

*Flynn v. Scott*, 2006 WL 1236718 at *5-6 (M.D. Ala. May 8, 2006) (citations omitted).

A prisoner "must allege facts showing that the allegedly retaliatory conduct would not have occurred but for the retaliatory motive." *Hempstead v. Carter*, 2006 WL 2092383, *5-6 (N.D. Fla. 2006) (emphasis added) (citing *Jackson v. Fair*, 846 F.2d 811, 820 (1st Cir. 1988)). "[A] causal connection may be alleged by a chronology of events that create a plausible inference of retaliation. *Id.* (citing *Cain v. Lane*, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)). However, "[t]he relevant showing . . . must be more than the prisoner's 'personal belief that he is the victim of retaliation.'" *Id.* (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). The prisoner must present with more than "general attacks" upon a defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that

plaintiff had carried his burden of proving the requisite motive. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (citations omitted). While a plaintiff may not be held to a heightened burden of proof, *see id.* at 580–86 (holding that a prisoner could not be required to show "clear and convincing" evidence of defendant's unconstitutional motives in a retaliation claim), courts should approach prisoner claims of retaliation "with skepticism and particular care" due to the "near inevitability" that prisoners will take exception with the decisions of prison officials and "the ease with which claims of retaliation may be fabricated." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir. 2001), *overruled in part on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

Here, McConico alleges four key facts to support his retaliation claim. First, McConico alleges that he and other inmates were discussing his current suit and their ability to file lawsuits of their own in Fountain's law library on November 18, 2020. Second, McConico claims that Warden Cook walked into the library, listened to the conversation, and then stated, "you just do what you want to do." (Doc. 18-1, PageID.46). Third, McConico avers that he responded to Warden Cook's comment, explaining that he and the other inmates were concerned about their safety due to ADOC's inadequate response to COVID-19 and that they were striving to learn about their constitutional rights. (Doc. 18-1, PageID.46). Fourth, McConico explains that on November 19, 2020, Warden Cook "arbitrarily" transferred him from Fountain to Easterling.[8] These allegations present at least a prima facie case of retaliation given

---

[8] McConico also includes several conclusory allegations about the purpose behind his transfer (e.g., his claim that Warden Cook transferred him to prevent him from

the close temporal relationship between McConico's protected expression and his subsequent transfer. Now, the burden shifts to Warden Cook to "rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the prison official retaliated against the inmate." *Flynn*, 2006 WL 1236718, at *6.

Warden Cook argues that McConico was transferred pursuant to a reduction in his custody level. Warden Cook submitted an unsworn declaration from Angie Baggett, who serves as Director of Classifications for ADOC. (Doc. 37-7). Director Baggett explains that in October 2020, ADOC approved a reduction in McConico's custody level to minimum custody. Accordingly, McConico became eligible for a transfer away from Fountain, which houses inmates with a higher custody level, to a lower-security correctional facility. McConico had documented enemies at seven other ADOC facilities—including Fountain, his pre-transfer residence—leaving his only enemy-free placements consistent with his new reduced custody level as Easterling and Bibb. Director Baggett also avers that frequent transfers are common, and McConico is no exception—he has been transferred ten times since 2015.

The undersigned finds that Warden Cook met her burden to raise a genuine issue of fact as to whether she retaliated against McConico. Specifically, Director Baggett's declaration establishes "a legitimate, non-retaliatory reason" for McConico's transfer—his reduced custody level and the presence of enemies at most

---

obtaining relief from this Court (*see* Doc. 18-1, PageID.47)). However, conclusory allegations "are insufficient to withstand a motion for summary judgment." *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005).

other facilities, including the facility in which he resided before the alleged retaliatory transfer. *See Flynn*, 2006 WL 1236718, at *6; *see also Smith v. Fla. Dep't of Corr.*, 318 F. App'x 726, 728 (11th Cir. 2008) (unpublished) (per curiam) (affirming the district court's dismissal of a retaliatory transfer claim because the prison official's proffered explanation for the transfer was not retaliatory). The burden now shifts back to McConico to present "sufficient evidence that the proffered reason for the adverse decision is a pretext for retaliation." *Id.*

McConico falls short of this burden. Having failed to submit any evidence in response to the present motion for summary judgment, McConico must rely on the allegations in his sworn complaint. McConico alleges that, on one hand, Warden Cook acted "arbitrarily" while also insisting that his transfer serves as retaliation for pursuing a lawsuit against her and other prison officials. (*See* Doc. 18-1, PageID.46). However, none of the allegations in McConico's sworn complaint rebut Warden Cook's explanation for his transfer, and in turn, he fails to present sufficient evidence showing that Warden Cook's "legitimate, non-retaliatory reason" for the transfer was pretext for retaliation. *See Flynn*, 2006 WL 1236718, at *6. Accordingly, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** in favor of Warden Cook as to McConico's First Amendment retaliation claims.

## IV.  *Conclusion*

McConico's allegations failed to demonstrate that Defendants acted with deliberate indifference to the risk posed by COVID-19. Further, McConico fails to rebut Warden Cook's credible, non-retaliatory explanation for his transfer.

Accordingly, the undersigned **RECOMMENDS** that Defendants' motions for summary judgment (Doc. 56; Doc. 70) be **GRANTED**.

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 15th day of August 2022.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**